HELLER, DELTAH CO., INC., ET AL. *v.* UNITED STATES

No. 7689.—Invoices dated August 23, 1937, etc.
Certified August 24, 1937, etc.
Entered at New York, N. Y., September 9, 1941, etc.
Entry No. 87121, etc.

(Decided March 21, 1949)

John D. Rode for the plaintiffs.

David N. Edelstein, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the defendant.

OLIVER, Chief Judge: The appeals for reappraisement listed in schedule "A", hereto attached and made a part hereof, involve the valuation of certain imitation pearl beads imported in strings of various lengths from Spain during the period from December 27, 1936, to April 30, 1938. The merchandise covered by all the importations

involved herein was invoiced and entered on the basis of export value (section 402 (d), Tariff Act of 1930) at various prices in dollars per 100 strings of 40 centimeters length, packed, as follows:

| Quality | Sizes | Date | Price |
|---|---|---|---|
| 292 | 3–7 to 6–12 | Dec. 1936 to July 1937 | $3.90 |
| 313 | 3–7 to 5–10 | May 1937 to Dec. 1937 | $3.80 |
| 313 | 6–12 | May 1937 to Dec. 1937 | $6.00 |
| 313 | 3–7 to 5–10 | Jan. 1938 to Apr. 1938 | $3.90 |

All the prices were based on strings 40 centimeters in length, the price for shorter or longer strings being in direct proportion. The merchandise was appraised on the basis of foreign value (section 402 (c), Tariff Act of 1930) in pesetos per 100 strings, packed, at various prices depending upon the length of the string in centimeters. The plaintiffs contend that during the period in which these pearls were exported, there was no foreign value for such or similar pearls and that the pearls should be valued upon the basis of export value as represented by the invoice and entered prices.

The defendant, on the other hand, contends that the merchandise was properly appraised on the basis of foreign value for such or similar merchandise and that the invoice and entered prices do not represent the export value since all sales were confined to these plaintiffs.

With respect to foreign value, the plaintiffs claim that during the involved period neither qualities 292 and 313 nor any merchandise similar thereto was sold or offered for sale in Spain. In support of this contention, there was received in evidence an affidavit of Edouard Heusch, managing director of the manufacturer, in which the affiant states that quality 313 took the place of quality 292, being slightly inferior thereto (exhibit 16). For the purpose of discussion herein, qualities 313 and 292 will be discussed as one quality and will be referred to hereinafter as quality 313.

The defendant maintains that imported quality 313 was such as or similar to "crack" quality sold and offered for sale in the home market. In support of its position, there were received in evidence reports of treasury representatives tending to show the similarity of "crack" quality to quality 313, and listing sales of "crack" quality in Spain at the prices adopted by the appraiser in these cases. Samples of quality "crack" and quality 313 (collective exhibit 17) and price lists therefor are attached to this exhibit.

The entire record is very confusing and contradictory but I am not convinced that the record establishes by a preponderance of the probative evidence that quality 313 is not such as or similar to "crack" quality, or that "crack" quality was not offered and sold in Spain within the definition of section 402 (c), Tariff Act of 1930, during the involved period.

In the recent case of *Fujii Junichi Shoten, Ltd., et al.* v. *United States*, 19 Cust. Ct. 198, Reap. Dec. 7310, the court stated:

\* \* \* The party appealing to reappraisement has the burden not only of overcoming the presumption of correctness of the appraiser's valuation, but of proving the correct dutiable value. *Harry. Garbey* v. *United States*, 24 C. C. P. A. 48, T. D. 48332. He must show the foreign value and the export value, or a foreign value and the nonexistence of an export value, or an export value and the nonexistence of a foreign value. *United States* v. *T. D. Downing Co.*, 20 C. C. P. A. 251, T. D. 46057.

Since the appraisements here were made on the basis of foreign value, which finding embraces the presumption that the export value for such or similar merchandise either is not higher than such foreign value or does not exist, I am of opinion that the failure of the plaintiffs herein to disprove the foreign value either as to basis or amount obviates the necessity of resolving the question as to the claimed export value. However, a résumé of the circumstances under which these export shipments were made may prove illuminating.

With respect to the claim that there was an export value for this merchandise, the plaintiffs maintain that during the involved period, quality 313 imitation pearl beads were freely offered and sold to all purchasers for exportation to the United States at the export values represented by the entered values. It is further maintained that no other qualities similar to quality 313 were ever sold or offered for sale for exportation to the United States during this period (exhibit 16).

The defendant contends that the merchandise was not freely offered to all purchasers for export to the United States at the invoice prices for the reason that all the export sales were confined to a limited number of purchasers.

The record discloses that two of the plaintiffs herein, together with the exporter, created a company in the United States known as the Perlas Import Co., another of the plaintiffs herein. Each party owned a one-third interest (R. 27) with a total investment of $2,100. The exporter's share in this enterprise was paid for by the other two participants, each of whom contributed one-half of the sum of $700 as the exporter's share in the company. An employee of one of these plaintiffs, one Bamberger, was assigned to take charge of the affairs of the new company. The overhead and operating expenses of the business were to be borne by the new company. The stated business of Perlas Import Co. was to buy and resell pearls on its own account and also to solicit orders and sell for Heusch, the manufacturer. Up to the time the new company was organized, plaintiffs Heller, Deltah Co., Inc., and D. Lisner & Co., Inc., were receiving all of the pearls shipped by the exporter to the United States. The record further discloses that only the plaintiffs herein purchased the involved merchandise at the invoice prices. No sales were made to

other purchasers at the invoice prices and all those who desired to purchase pearls directly from the manufacturer were referred to the Perlas Import Co. (R. 130).

The witness Lisner testified as to an agreement whereby Perlas Import Co. was to be paid a 7 per centum commission on all pearls sold for Heusch. Subsequently, the witness stated that he was in error as to this arrangement (R. 66). In response to the court's inquiry, he then stated that "The details of that are very vague in my mind." The same witness testified that he had helped organize the new corporation in direct competition with his own company (R. 79) and that he agreed to Perlas Import Co.'s offering pearls at $3.90, one of the invoiced prices here, which was *at a loss* in order to further the interests of the exporter. Despite his previous testimony that the manufacturer could not fill the orders of his company on time, the witness stated that the new company was formed to buy the excess production of the exporter's pearls. A letter from the exporter to one of the plaintiffs herein, states in part "* * * which in reality would have as object to avoid creating for you and for us new competition, and to keep as much as possible the pearl market in your hands, in those of Messrs. D. Lisner & Co. and in ours * * *" (collective exhibit 18, page 3).

Witness Rosenblatt testified that while in Paris in 1937, he was offered pearls similar to those purchased by Heller, Deltah Co., Inc., and others in the United States. He stated that these pearls were offered for sale by a Mr. Passeau at a price below 4 cents a string and that he believed they were being offered on behalf of the manufacturer (R. 138). On cross-examination, however, he admitted that the manufacturer made different qualities and that he did not know the style numbers or the qualities of the pearls offered (R. 141). The record does not disclose that Mr. Passeau ever bought or received any offers from the manufacturer of quality 313 pearls (collective exhibit 18, page 15).

Witness Meyer stated that an effort to purchase pearls direct from Heusch resulted in being referred to the Perlas Import Co., with which he placed an order at 10½ cents per string. He testified that he ordered pearls from Perlas on October 26, 1937, and was promised delivery by February 1, 1938, but that when he endeavored to purchase the pearls direct, he was informed that he would not be able to get them "for a long time" (R. 166). The argument that the pearls were not sold to others than the plaintiffs because of the refusal to put up a letter of credit did not apply to Meyer, who was willing to do so.

On this record, I find the following findings of fact and conclusions of law:

(1) That the merchandise herein consists of imitation pearl beads imported from Spain, qualities 292 and 313.

(2) That such or similar merchandise, known as quality "crack," was sold in Spain.

(3) That the record fails to establish that there was no foreign value for this merchandise within the definition of section 402 (c), Tariff Act of 1930, and the presumptively correct appraised values have not been overcome.

Accordingly, I conclude that the proper basis of appraisement of the involved merchandise is foreign value, as defined in section 402 (c), Tariff Act of 1930, and that such foreign values are the appraised values.

Judgment will be rendered accordingly.